# EXHIBIT H

**LAW OFFICES OF NEAL H. FLASTER, L.L.C.**
Neal H. Flaster, Esq.
New Jersey Bar No.: 071611981
30A Vreeland Road, Suite 230
P.O. Box 21
Florham Park, New Jersey 07932
. Tel. No.: 973-822-7900
Facsimile: 973-822-7923
Attorneys for Plaintiff, Gary D. Abella


RECEIVED & FILED
SUPERIOR COURT
2014 NOV 10 P 3: 43
MORRIS COUNTY
CIVIL DIVISION

| | |
|---|---|
| GARY D. ABELLA, | : SUPERIOR COURT OF NEW JERSEY |
| | : LAW DIVISION: MORRIS COUNTY |
| Plaintiff, | : |
| | : |
| | : |
| vs. | : *Civil Action* |
| | : |
| | : |
| SEVEN SEVEN SOFTWARES, INC., a | : DOCKET NO.: L-000235-14 |
| New Jersey corporation and SEVEN | : |
| SEVEN CORPORATE GROUP, an | : |
| unincorporated entity, individually or | : |
| collectively, through their alter egos, | : |
| affiliates, subsidiaries, agents, | : |
| representatives, branches or assigns, | : |
| SEVEN SEVEN GLOBAL SERVICES, | : |
| INC., an alien corporation, ELMER L. | : |
| MAXIMO, ADELA SERING, | : **AMENDED COMPLAINT** |
| also known as ADELA SERING-FOJAS, | : **AND JURY DEMAND** |
| JOHN DOES 1-10 (names being | : |
| fictitious, and ABC COMPANIES 1-10 | : |
| (names being fictitious), individually, | : |
| jointly and severally, | : |
| | : |
| Defendants. | : |
| | : |

Plaintiff Gary D. Abella, residing at 1-B Dahlia Street, JEM Subdivision, Parang, Marikina

City, Metro Manila, Philippines by way of Amended Complaint alleges and says the following:

## NATURE OF THE ACTION

1.     This action arises as a result of conduct undertaken by Defendants Seven Seven

Softwares, Inc. ("Seven Seven Softwares") and Seven Seven Corporate Group ("Seven Seven Corporate Group"), individually or collectively and/or through their alter ego(s), affiliate(s) subsidiary(s), agent(s), representative(s), branch(s) or assign(s), Defendant Seven Seven Global Services, Inc. ("Seven Seven Global Services") and their representatives, Elmer L. Maximo ("Maximo") and Adela Sering, also known as Adela Sering-Fojas ("Sering"), in wrongfully terminating Plaintiff, Gary D. Abella ("Abella") from employment for refusing to waive his right to be paid wages as a non-immigrant worker at least equal to the actual wages paid by an employer to other workers with similar experience and qualifications. Defendants' actions were undertaken *inter alia*, in violation of the Immigration and Nationality Act ("INA"), 8 U.S.C. 1101 et seq., the Code of Federal Regulations, 20 CFR Ch. V, as applied to the H-1B non-immigrant visa classification for specialty occupations and the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1 et seq.

2. The INA sets forth certain prerequisites for companies, such as Seven Seven Softwares, Seven Seven Corporate Group and Seven Seven Global Services wishing to employ H-1B non-immigrant workers in the United States. Under the terms of the INA, the employer is required to file a Labor Condition Application ("LCA") form stating that it will pay non-immigrant workers at least the local prevailing wage or the employer's actual wage, whichever is higher, pay for non-productive time in certain circumstances and offer benefits on the same basis as for U.S. workers.

3. The INA bars employers of H-1B non-immigrant workers from intimidating, threatening, blacklisting, discharging or in any other manner discriminating against any employee,

2

former employee or job applicant from disclosing violations of H-1B provisions, or for cooperating in an official investigation of the employer's compliance.

4.       Defendants Seven Seven Softwares and Seven Seven Corporate Group, individually or collectively and/or through its alter ego(s), affiliate(s), subsidiary(s), agent(s), representative(s), branch(s) or assign(s), Seven Seven Global Services and its high ranking managerial employees, officers and owners, including but not limited to Defendants Maximo and Sering, solicited Plaintiff for employment in the United States pursuant to an agreement obligating him to work for Defendants for two years for substantially higher wages than what he would have earned in his native Philippines, based on the promise that they would assist him in processing his permanent labor certification and immigration papers, known as a "green card". This would *inter alia*, authorize Plaintiff to live and work in the United States, apply for Social Security benefits and obtain a driver's license.

5.       Despite being obliged to comply with applicable federal and state laws and regulations regarding non-immigrant workers and prior to finalizing obtaining a "green card" for Plaintiff, Defendants requested that Plaintiff waive their compliance requirements with the prevailing wage standard. When Plaintiff objected, Defendants, in whole or in part, individually or collectively, retaliated against him, refused to complete the processing of his "green card" application and claimed as a pretext for his wrongful termination, that they were "unable" to locate project assignments for the Plaintiff in the United State. Upon the expiration of Plaintiff's visa in May 2013, Plaintiff had no choice but to return to the Philippines or face involuntary deportation or alternatively, incarceration for failing to do so.

3

6. Plaintiff asserts claims against Defendants arising from their violations of federal laws and regulations as they implicate Defendants' violations of the New Jersey Conscientious Employees Protection Act, N.J.S.A. 34:19-1 et seq. and common law claims including but not limited to fraud, breach of contract, breach of the covenant of good faith and fair dealing and civil conspiracy.

## PARTIES

7. Plaintiff Gary D. Abella currently resides at 1-B Dahlia Street, JEM Subdivision, Parang, Marikina City, Metro Manila, Philippines; however, at the time of Plaintiff's wrongful termination as alleged herein, he was a resident of the State of North Carolina.

8. Defendant Seven Seven Softwares, a New Jersey Corporation incorporated in or about October 21, 1996 with its principal place of business located at 217 East Main Street, Rockaway, County of Morris and State of New Jersey, exercises dominion and control over the business affairs of Seven Seven Corporate Group and Seven Seven Global Services through common ownership of these companies *inter alia*, as its alter egos affiliates, subsidiaries, agents, representatives, branches or assigns.

9. Defendant Seven Seven Corporate Group has offices located at the same address as Seven Seven Softwares at 217 East Main Street, Rockaway, New Jersey and claims to be an unincorporated subsidiary of Seven Seven Softwares. Seven Seven Corporate Group holds itself out to the public as the parent company of Seven Seven Softwares and Seven Seven Global Services and promotes itself as a comprehensive and integrated IT Services Company offering services for onsite consulting and placement, software development, business process outsourcing,

4

production and application support and call center services through Seven Seven Softwares in the United States and Seven Seven Global Services in the Philippines.

10.     Defendant Seven Seven Global Services, with offices located at 2701, 27/F The Orient Square, Building, F. Ortigas Jr. Road, Ortigas Center, Pasig City, Philippines is an alien corporation, formed in the Republic of the Philippines in or about February, 16, 2005. Seven Seven Global Services claims to be a subsidiary of Defendants Seven Seven Softwares and/or Seven Seven Corporate Group and promotes itself as a "A Seven Seven Softwares Company".

11.     Defendant Adela Sering, also known as Adela Sering- Fojas ("Sering") resides at 53 Fernwod Road, Rockaway, County of Morris and State of New Jersey. Sering is an owner, officer and principal of Seven Seven Softwares and is designated in the company's certificate of incorporation as its President and Director and in its most recent public filing, as its Chief Executive Officer. Sering is also an owner and principal of Seven Seven Corporate Group and Seven Seven Global Services.

12.     Defendant Elmer Maximo ("Maximo") is employed by the Defendants as both Vice President and Senior Managing Director for Seven Seven Global Services HR and Vice President of Seven Seven Corporate Group, while employed at the offices of Seven Seven Softwares/Seven Seven Corporate Group located at 217 East Main Street, Rockaway, New Jersey.

## FACTS COMMON TO ALL PARTIES

13.     Plaintiff Gary D. Abella repeats and realleges each and every allegation contained in Paragraphs 1 through 12 of the Amended Complaint, as if incorporated by reference herein.

14.     In or about April 2, 2004, Plaintiff, a native of the Philippines, was referred to

Marcario Fojas, President of Seven Seven Softwares for employment with Defendants. In or about May 5, 2004, Plaintiff was invited to interview with Mr. Fojas, who was in the Philippines at the time, for a position as a Senior Mainframe Developer with CyberJ Resources, Inc. ("CyberJ Resources"). Upon information and belief, CyberJ Resources was owned in whole or in part by Defendant Sering, who was married to Mr. Fojas, and Defendants Seven Seven Softwares /Seven Seven Corporate Group.

15.     On May 5, 2004, Maximo, on behalf of Seven Seven Corporate Group/Seven Softwares participated in Plaintiff's interview from his offices in Rockaway, New Jersey, communicating by e-mails regarding Plaintiff's possible employment with Defendants through an e-mail address entitled "emaximo@77soft.com", associated with Seven Seven Softwares and Seven Seven Corporate Group.

16.     In May 2004, Maximo arranged for Plaintiff to interview by telephone with Defendants' client, Bear Stearns & Company ("Bear Stearns"), who Plaintiff would be working with on a project based in New Jersey. Plaintiff successfully passed the interview and was offered a job with CyberJ Resources. On June 18, 2004, Plaintiff executed a written employment contract with CyberJ Resources that required that he work for the company for two years and that his employment would be subject to a two year restrictive covenant prohibiting him from joining a competitive company, either as an employee, owner, partner, agent, stockholder, director or officer, engaging in any activity competitive with CyberJ Resources or working with and for any competitor in approximately the same line of business or any client. If Plaintiff committed an act of disloyalty, which included but was not limited to his intentional and/or premeditated failure to

6

complete the two year term of employment, he would have to pay a penalty to CyberJ Resources, without prejudice to the company's right to file civil and/or criminal actions against him. See Exhibit A, annexed hereto.

17.    In September 2004, Plaintiff began working in the Philippines as a Senior Mainframe Programmer for Defendants on a two year project (Consolidated Interest System) for the client, Bear Stearns. Thereafter, CyberJ Resources began transitioning ownership to Seven Seven Global Services and/or Seven Seven Softwares/Seven Seven Corporate Group, which was completed by October 1, 2005. In or about February 2006, Plaintiff met again with Mr. Fojas, who was physically present at the Seven Seven Global Office in the Philippines to request an increase in salary, which was granted.

18.    In October 2006, Plaintiff completed his two year project (Consolidated Interest System) for Bear Stearns. By in or about November 2006, Cathy Alonso, who was responsible for Business Development for Seven Seven Corporate Group, found him a new project with Bear Stearns. As a condition for his employment on this new project, Plaintiff was required to visit the Bear Stearns facilities in New Jersey for an initial period of three months for project scoping. When that stage of the process was completed, Plaintiff was to return to the Philippines to set up the project team that he would be working with and eventually, to return to New Jersey to manage the project from there. Upon advice of Seven Seven Global Services/Seven Seven Softwares, Plaintiff applied for a B1/B2 combined business/tourist visa at the United States Embassy in Manila, Philippines.

19.    In connection with this application, on October 27, 2006 Mr. Fojas, as President

7

of Seven Seven Softwares, wrote to Seven Seven Global Services, Inc. ,Unit 802 Orient Square,

Emerald Avenue, Ortigas Center, Pasig City, Philippines stating that:

> We would like to request you to send your Senior Mainframe Developer, Mr. Gary D. Abella to our corporate office in New Jersey for three months to our valued client, Bear Sterns. He needs to be onsite to gather requirements and to conduct systems review and analysis of the client's systems that will start on the first week of December 2006.
>
> His study will be part of his preparations for a project he will be handling in Manila. We would prefer it if you immediately commence preparations to send him to the United States at the aforementioned schedule.

19.     On the same date, October 27, 2006, Mr. Fojas wrote to the Chief, Nonimmigrant

Visa Section, U.S. Embassy, Manila, Philippines, identifying himself as President of Seven

Seven Softwares based in Rockaway, New Jersey and acknowledged that:

a)     Mr. Abella was an employee of Seven Seven Global Services Incorporated;

b)     Seven Seven Global Services was a subsidiary of Seven Seven Softwares, a corporation existing under United States law, based in Rockaway, New Jersey;

c)     Seven Seven Software's client, Bear Stearns, requested that Seven Seven Softwares send Senior Mainframe Developer, Gary D. Abella to Bear Stearn's offices in the United States to gather requirements onsite in order to conduct systems review and analysis; and

d)     this request was related to a project starting in the first week of December 2006 in conjunction with work that Mr. Abella would be handling in Manila, Philippines.

See Exhibit B, annexed hereto.

20.     In connection with the B1/B2 visa application, on October 27, 2006 Milagros S.

Picache, Senior Managing Director/COO of Seven Seven Global Services, a Seven Seven

8

Softwares Company, wrote to the "Honorable Consul, Non-Immigrant Visa Section, Embassy

of the United States of America, Roxas Boulevard, Ermita, Manila" stating *inter alia* that:

> I am writing to request the issuance of a business visa for our employee mentioned
> below who will meet the client to gather requirements and systems analysis for a
> software development project.

| | |
|---|---|
| Name of Employee | Gary D. Abella |
| Position | Senior Mainframe Developer |
| Name of the company in the US | Seven Seven Softwares |
| Location | New Jersey |
| Itinerary/Date/Location | Manila-Newark/December 11, 2006 |
| | Newark-Manila/March 11, 2007 |

21.     On November 19, 2006, Ms. Alonso sent Plaintiff an email with a copy of a

message from an email address entitled "calonso@77soft.com", associated with Seven Seven

Softwares/Seven Seven Corporate Group, confirming a "kick-off" meeting scheduled for

November 20, 2014 with Bear Stearns. Ms. Alonso signed the email as *"Cathy Alonso, Business

Development, Seven Seven Corporate Group, 217 East Main Street, Rockaway, New Jersey USA

07866".*

22.     On November 22, 2006, Maximo sent Plaintiff an "Offer Letter" utilizing the e-mail

address entitled  emaximo@77soft.com, associated with Seven Seven Softwares/ Seven Seven

Corporate Group, setting forth the terms and conditions for a proposed two year employment

agreement.

23.     Thereafter, Plaintiff entered into negotiations with Maximo and other employees of

Seven Seven Softwares/Seven Seven Corporate Group, including but not limited to Milagros

Picache, Cathy Alonso and Peter Abastillas over the terms of the proposed employment contract.

One point of contention was Plaintiff's insistence that Defendants guarantee his transfer of work to

the United States within six months of Plaintiff's execution of the contract. Although Defendants

initially refused to agree to such a provision and threatened to bar Plaintiff from traveling to New Jersey to meet with Bear Stearns, they ultimately relented and incorporated such language in the agreement.

24.     Thus, on December 2, 2006, Plaintiff executed an agreement known as the "Memorandum of Undertaking" ("MOU") with Seven Seven Global Services (defined pursuant to the agreement as the "Company"), in its capacity as the alter ego, agent, subsidiary, affiliate, representative, branch or assign of Seven Seven Corporate Group and/or Seven Seven Softwares.

25.     The MOU was countersigned on February 12, 2007 by Milagros Picache, Senior Managing Director and Chief Operating Officer of Seven Seven Global Services and provided *inter alia*, that:

     a.    As part of "company" privileges afforded to Senior Developers and Technical employees, Plaintiff agreed to accept the Company's offer to process his application for a L1 visa based on the understanding that certain Terms and Conditions would be incorporated into the program.

     b.    The Company would process Plaintiff's L1 visa upon receipt of the executed agreement;

     c.    The Company would process Plaintiff's deployment for United States onshore assignment within six (6) months upon signing of the agreement;

     d.    In the event that Plaintiff was assigned to work permanently in the United States, he would be given an annual salary of $70,000(U.S.), medical and dental insurance, airfare, including travel tax and airport terminal fee, free lodging for one month upon arrival, two weeks (10) days paid vacation leave, all immigration fees, salary review after the first (1st year of employment);

     e.    After six months of satisfactory service to the Company, Defendants would sponsor the processing of Plaintiff's permanent labor certification and immigration papers ("Green Card");

     f.    The Company agreed to "shoulder" all costs pertaining to processing the

L1 visa in the amount of $5,000.00.

g.    In consideration for entering into this agreement, Plaintiff committed himself to work for the Company two years from the date of the agreement and to perform the jobs, functions, and services embodied within the agreement to the best of his abilities and to the satisfaction of the Company and its clientele.

h.    Plaintiff would perpetually keep confidential and not disclose to any third party, any and all information, technical and trade secrets, and exclusive procedures and methodologies owned by the Company, which Plaintiff may have gained knowledge of or come into possession in the course of performing his job functions and other responsibilities with the Company.

i.    Plaintiff would not join any competitive company, either as an employee, owner, partner, agent, stockholder, director or officer of a corporation or otherwise, or engage in any activity competitive with that of the Company, or work with, and for any competitor (any business entity engaged in approximately the same line of business as the Company) or client of the Company for twenty- four (24) months or two (2) years from the date of resignation, termination from employment and/or separation from employment for any reason.

j.    No right, other than employee rights under Philippine labor laws would be vested to the Plaintiff, with the Company retaining the sole and exclusive prerogative to determine the qualification of the Plaintiff for an L1 Visa even after the application was filed with the appropriate authorities.

k.    The Company reserved the right to take steps to suspend and/or discontinue or withdraw the L1 visa application of the Plaintiff based solely on the following grounds:

1.    *Acts of disloyalty*, including but not limited to a) the intentional and/or premeditated failure of the employee to complete the minimum term of two (2) years work as stipulated in Section 5 of the MOU for no valid reason or without just cause, especially in cases where the employee becomes employed or retained by an employee in violation of Section 6 of the MOU; b) being employed by or serving as an employee for any current or former client of the Company or any other means by which herein the employee enters into a contractual relationship with any current or former client of the Company during the period prohibited by this paragraph; c) convincing, soliciting or attempting to convince or solicit co-workers and/

or colleagues likewise retained or employed in the Company to work for or with any current or former client of the Company; and d) acceptance by the employee of a job and/or establishment of his/her own business that requires or principally involves the application of the same skills gained as a consequence of working with the Principal by virtue of the MOU during the prohibited twenty four (24) months or two (2) years from the date of resignation, termination of employment and/or separation from employment for any reason.

2. *Failure of the Employee to maintain company standards in performance that serves as the basis for the qualifying candidates.*

3. *Failure of the Employee to comply with client requirements and policy.*

1. In any instance where the Employee (e.g., Plaintiff) committed any act of disloyalty in violation of the stipulations set forth herein and/or commits any act which is a ground for disciplinary action and/or termination of employment and which in turn, causes the Company to discontinue the processing of his L1 Visa, the Employee shall be liable to pay the Company the sum of $5,000 in its corresponding current Peso value as and by way of liquidated damages to cover for the expense for processing the L1 visa of the employee.

See Exhibit C, annexed hereto.

26. By the terms of the MOU, all rights and obligations of the parties requiring the Company to undertake to process Plaintiff's L-1 visa were subject to the legal requirements for same under federal law that permitted Seven Seven Global Services to transfer or assign Plaintiff to render services for or on behalf of Seven Seven Softwares in the United States temporarily as a branch of the same employer or a parent, affiliate, or subsidiary in a managerial or executive capacity or one that involves specialized knowledge.

27. Plaintiff left the Philippines to travel to New Jersey on December 3, 2006 and returned to the Philippines on February 28, 2007. While he was in New Jersey and contrary to his understanding that he was only there for "project scoping", he was given programming tasks by Bear

12

Stearns which he believed to be a violation of his B1 visa. It was Plaintiff's belief that Seven Seven Global Services/Seven Seven Software and/or Seven Seven Corporate Group purposely entered into that arrangement with Bear Stearns without disclosing same prior to Plaintiff's leaving the Phillippines for New Jersey because they feared that Plaintiff would object to same as being inconsistent with his visa.

28.     Before Plaintiff left New Jersey for Manila on February 28, 2007, he spoke with a representative of Bear Stearns and it was agreed that he had to return to New Jersey before April 2007. Plaintiff advised Seven Seven Corporate Group/Seven Seven Software employees (e.g., Cathy Alonso and Defendant Maximo) of client's requirements and they advised that they would file his L1A visa application to permit him to return to New Jersey.

29.     In order to qualify for admission to the United States as a L-1A intra-company transferee, 8 CFR 214.2(l) provides that under §101(a)(15)(L) of the Immigration and Nationality Act, an alien who within the preceding three years has been employed abroad for one continuous year by a qualifying organization may be admitted temporarily to be employed by a parent, branch, affiliate or subsidiary of that employer in a managerial or executive capacity, or in a position requiring specialized knowledge.

30.     An alien transferred to the United States under this non-immigrant classification is referred to as an intra-company transferee and the organization which seeks the classification of an alien as an intra-company transferee is referred to as the petitioner. The term, "intra-company transferee" is defined by 8 CFR 214.2(l)(1)(ii) as an alien who, within three years preceding the time of his or her application for admission into the United States, has been employed abroad continuously for one year by a firm or corporation or other legal entity or

13

parent, branch, affiliate, or subsidiary thereof, and who seeks to enter the United States temporarily in order to render his or her services to a branch of the same employer or a parent, affiliate, or subsidiary thereof in a capacity that is managerial, executive, or involves specialized knowledge.

31.     Under 8 CFR 214.2(l)(1)(ii)(D), the term "specialized knowledge" is defined as special knowledge possessed by an individual of the petitioning organization's product, service, equipment, techniques, management, or other interests and its application in international markets, or an advanced level of knowledge or expertise in the organization's processes and procedures.

32.     Under 8 CFR 214.2(l)(1)(ii)(E), the term "specialized knowledge professional" is defined as an individual who has specialized knowledge as defined in paragraph (l)(1)(ii)(D) and is a member of the professions as defined in section 101(a)(32) of the Immigration and Nationality Act.

33.     The I-129 Petition for Nonimmigrant Worker and Classification Supplement was filed by Maximo on behalf of Seven Seven Softwares, through its attorney, Aurelio L. Caparas, whose office address is 225 West 34th Street, New York, New York. The document identified "Seven Seven Softwares, Inc." as the name of the person or organization filing petition, lists Seven Seven Global Services as the "name of employer abroad" and refers to a letter submitted from its "affiliate".  See Exhibit D, annexed hereto.

34.     By letter dated May 9, 2007 from Maximo on letterhead sent from "Seven Seven Corporate Group" and "Seven Seven Softwares", Maximo acknowledged that "we write in

14

connection with a I-129 petition that we are filing for Gary D. Abella, a Philippine national who is currently employed by our Philippine affiliate Seven Seven Global Services, Inc. as a project manager. He will be coming to the U.S. to continue his duties as project manager." See Exhibit E, annexed hereto.

35.    In this letter, Maximo acknowledged that:

a)    Seven Seven Softwares is a New Jersey based company owned and managed 100% by Adela Sering, wife of Macario S. Fojas;

b)    Mr. Abella is currently employed by Seven Seven Global Services, a Philippine company "almost wholly owned" (98%) by the spouses, Adela Sering (who owns 51%) and Macario Fojas (who owns 47%);

c)    Seven Seven Global Services is the successor in interest to CyberJ Resources, where Mr. Abella started his employment, with the spouses, Adela Sering and Macario S. Fojas owning 51% of CyberJ Resources;

d)    CyberJ Resources was set up by Seven Seven Softwares in the Philippines in response to their clients demands for alternatives to reduce their information technology costs;

e)    Cyber J Resources subsequently transferred and assigned its business and activities to Seven Seven Global Services, Inc., and

f)    Seven Seven Global Services currently handles Seven Seven Software's outsourcing and offsite activities. See Exhibit I, annexed hereto.

36.    The I-129 petition was granted, thereby allowing Plaintiff to work in the United States temporarily based on his status as a person with specialized knowledge or a professional with specialized knowledge.

37.    Plaintiff was admitted to the United States in or about June 15, 2007 to work as an onsite Project Manager for Bear Stearns in New Jersey, with wages paid via a payroll account in the name of Seven Seven Softwares. Plaintiff worked in this capacity for several months until

15

he was released by Bear Stearns on November 30, 2007 because of its financial difficulties.

38. Shortly after his release, Plaintiff met with Maximo to discuss Seven Seven Software's plans going forward. Maximo advised Plaintiff that Seven Seven Softwares was not going to send him back to the Philippines yet and that the company would look for new project assignments while it continued to pay his $70,000.00 annual salary. Plaintiff was told that his L1A visa status would remain as is.

39. On December 10, 2007, Seven Seven Software/Seven Seven Corporate notified Plaintiff of an opening at Credit-Suisse in Raleigh, North Carolina for a position as a Senior Mainframe Developer in the same or similar position that he had at Bear Stearns and at the same annual salary of $70,000 set forth in the MOU. Plaintiff had an interview with Credit-Suisse and in late January 2008, he was notified by Seven Seven Software/Seven Seven Corporate that he had passed the interview and would be expected to start working at Credit-Suisse on February 12, 2008.

40. Plaintiff relocated to North Carolina from New Jersey on February 8, 2008 for an initial contract of six months that was extended several times. He was paid via a payroll account in the name of Seven Seven Softwares.

41. Defendants conducted a review of Plaintiff's salary after his first year of employment in accordance with Section 4 of the MOU and awarded him a salary increase of $5,000 effective June 2008, thereby bringing his annual salary to $75,000.

42. In addition to the salary review, Defendants were required to sponsor processing of Plaintiff's permanent labor certification and immigration papers (e.g., "green card") in accordance

with Section 4 of the MOU after six months of satisfactory service

43. In June 2008, Plaintiff initiated discussions with Maximo via Defendant's e-mail account at Seven Seven Softwares to obtain his promised "green card" sponsorship. At no time therein, did Maximo or any other Defendant deny any responsibility on the part of Seven Seven Softwares to process same, as required by the MOU.

44. Plaintiff, after several months preparing the "green card" application and supporting documents, received a copy of the finalized forms for his verification and signature from Aurelio Caparas, Esq., attorney for Seven Seven Corporate Group/Seven Seven Softwares in the United States, with the processing of the "green card" based on Plaintiff's L-1A position as a Project Manager.

45. In March 2009, Plaintiff returned the signed copies of the forms, together with supporting documents requested by Mr. Caparas. However, two months later in May 2009, Mr. Caparas advised Plaintiff that he could not file the application for the "green card" due to a lack of supporting documents. Although Maximo represented to Plaintiff that he would provide the necessary supporting documents requested by Defendants' attorney, he failed to do so.

46. Plaintiff was bound to continue employment with Seven Seven Softwares/Seven Seven Corporate Group by the terms and conditions of the MOA and the limitations of his L-1A visa, which is reserved for intracompany transfers and not intercompany transfers. On July 21, 2009, Plaintiff wrote to Maximo at Seven Seven Softwares/Seven Seven Corporate Group in New Jersey, which he followed up with an e-mail, requesting that Defendants comply with the terms of the MOU and process his "green card" application immediately.

17

47.     In response thereto, Defendants retaliated against Plaintiff, informing him that he had just two options available to him, namely agree to re-start his "green card" processing via PERM Labor Certification process and change his L-1A Visa to an H-1B visa or resign from Seven Seven Softwares. Faced with this ultimatum, Plaintiff agreed to the change in the status of his visa from L-1A to H-1B, which would permit Seven Seven Softwares to process his "green card" application via PERM. The change of status was approved in January 2010, with the "green card" PERM (EB2) process initiated in March 2010.

48.     When the wage determination for the PERM position was received in June of 2010, there was a significant salary disparity between Plaintiff's H-1B position and the PERM position. Due to this disparity, Maximo requested that Plaintiff confirm in writing that the PERM position was "prospective" only, with Plaintiff waiving his right to be paid in accordance with the salary requirements of the PERM prevailing wage determination.

49.     Plaintiff refused to sign the proposed confirmation letter because his position at Credit Suisse, for which he was being paid $75,000 annually by Seven Seven Softwares, was exactly the same as the advertised PERM position that offered a salary of $110,822 annually.

50.     On October 1, 2010, Maximo, on behalf of Seven Seven Softwares/Seven Seven Corporate Group and Defendant Sering advised Plaintiff that the company would continue with the "green card" process despite Plaintiff's refusal to execute the confirmation letter as a pre-requisite to proceeding with the filing process. At no time therein, did Defendants deny any responsibility to undertake such an obligation under the MOU and the PERM application was filed and approved in December 2010.

51.     Notwithstanding these representations, seven months later on May 24, 2011 Maximo insisted that Plaintiff sign the confirmation letter as a pre-requisite for Seven Seven Softwares' filing of the I-140 visa application. Plaintiff refused and thereafter, Defendants failed to file the I-140, resulting in the previously approved PERM lapsing on June 30, 2011.

52.     On June 5, 2012, Plaintiff was informed by telephone by his supervisor at Credit Suisse that his contract position would end on June 30, 2012 and that he would not be retained as a consultant, although the company would be interested in hiring him as a full time employee. Because Mr. Abella's H-1B visa was due to expire on October 1, 2012 due to Defendants' failure to file the requisite I-140, Plaintiff could not accept the offer of employment from Credit-Suisse because his visa would not permit same. Plaintiff advised his supervisor the following day, June 6, 2012 that he had to decline the offer.

53.     On June 5, 2012, Plaintiff advised Maximo by e-mail addressed to Defendant's e-mail account at Seven Seven Softwares that his contract position with Credit Suisse would be terminated effective June 30, 2012.

54.     On June 24, 2012, Plaintiff spoke by telephone with Maximo and Seven Seven Software's attorney, Mr. Caparas, at which time he advised them that Credit Suisse would not extend his contract and asked what Seven Seven Softwares' plans were with regard to this turn of events. During that telephone call, Plaintiff reiterated his previous concerns about his "green card" application status and the salary discrepancy between his H-1B position and the PERM position. Maximo agreed to proceed with Plaintiff's H-1B extension and PERM processing; however, Mr. Caparas said that before he could file the H-1B visa extension application, it was

necessary to settle the disagreement over the discrepancy in salary between Plaintiff's H-1B position and the PERM position.

55. On June 25, 2012, Plaintiff provided Maximo via e-mail through Defendant's e-mail account at Seven Seven Softwares with copies of the job description duties for his current position at Credit Suisse. This was the same document that Plaintiff had sent to Seven Seven Softwares on October 27, 2009 to initiate his change in status from L-1A to H-1B in connection with the Plaintiff's Labor Condition Application attached to his H-1B extension application.

56. In the same e-mail, Plaintiff requested a new Labor Condition Application based on the description of his job duties for his current position at Credit Suisse before filing for the H-1B extension. Plaintiff also requested payment from Defendants for the difference between his current salary and the rate indicated on the PERM application that was approved in December 2010, including back pay retroactive to June 15, 2009, which reflected the completion of his commitment to stay with the Company for two years under the MOU.

57. In or about the third week of June 2012, Plaintiff's supervisor at Credit Suisse asked whether Plaintiff would extend his contract position with them (through Seven Seven Softwares) for an additional two months to allow time for a proper turnover of duties and responsibilities until the company could locate a suitable replacement for him. Plaintiff agreed to this extension of employment, which was permitted under his visa.

58. In a telephone conversation between Plaintiff and Maximo that took place on July 17, 2012, Maximo agreed to discuss the requests made by Plaintiff with appropriate personnel at Seven Seven Softwares, including Defendant Sering, its Chief Executive Officer and President.

In the course of several telephone conversations between July 17, 2012 and August 31, 2012, Plaintiff was told repeatedly by Maximo that the discussions regarding Plaintiff's requests were not concluded.

59.     On September 2, 2012, Maximo advised Plaintiff that Seven Seven Softwares intended to find him a new project assignment within the next thirty days but if they failed to do so, he would be terminated from employment.

60.     On September 11, 2012,Maximo advised Plaintiff that he was informed by Seven Seven Softwares' attorney, Mr. Caparas that it was imperative that Plaintiff have a new project assignment by September 20, 2012 at the latest, or Plaintiff's current H-1B visa could not be extended.

61.     On September 12, 2012, Maximo represented to Plaintiff that Seven Seven Softwares could not afford the salary adjustment with the back pay requested and therefore, declined his demand.

62.     On September 20, 2012, Plaintiff sent an e-mail to Maximo at his e-mail address at Seven Seven Softwares to inquire about the status of Seven Seven Software's efforts. Maximo responded, claiming that Seven Seven Softwares was unable to find a project assignment for him and thus, Plaintiff would be terminated from employment at the end of September 2012. This claim was nothing more than a pretext by Defendants to retaliate against Plaintiff and wrongfully terminate him for refusing to waive his right to a prevailing wage, as protected by law.

63.     Because Plaintiff's H-1B visa was scheduled to expire on October 1, 2012, he filed an application on September 28, 2012 to have his status changed to B2. Plaintiff was

granted legal status, but the terms were valid only through March 31, 2013. Plaintiff filed an appeal of that decision on March 22, 2013 to permit him to remain on an extended visa in the United States, which was approved on May 28, 2013 but only on a limited basis through May 31, 2013.

64.     Since there was not sufficient time to file and be heard on another appeal by the May 31, 2013 end date, Plaintiff was compelled to return to the Philippines on May 31, 2013 to avoid involuntary deportation or alternatively, incarceration.

## COUNT ONE
## NEW JERSEY CONSCIENTIOUS EMPLOYEE PROTECTION ACT
### N.J.S.A. 34:19-1 et seq.

65.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 64 of the Amended Complaint, as if incorporated by reference herein.

66.     Plaintiff entered into an employment contract with Seven Seven Global Services pursuant to the MOU beginning in or about July 12, 2004, the date of his first hire, until in or about June 14, 2007, when responsibility for Plaintiff's employment was transferred to Seven Seven Softwares, the parent company to Seven Seven Global Services, when he came to the United States to work pursuant to a visa issued for nonimmigrant workers.

67.     All rights and obligations by Seven Seven Global Services to Plaintiff as set forth in the MOU were assigned, transferred or otherwise assumed by Seven Seven Softwares/Seven Seven Corporate Group in their continued employment of Plaintiff,

68.     At the time of Plaintiff's wrongful termination, Seven Seven Softwares/Seven Seven Corporate Group and to the extent applicable, Seven Seven Global Services were

22

employers within the definition of the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-2(a).

69.     At the time of Plaintiff's wrongful termination, Defendant Sering was an employer, as a person acting directly or indirectly on behalf of Seven Seven Softwares/Seven Seven Corporate Group and Seven Seven Global Services within the definition of the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-2(a) and in that capacity controlled the work performance of the Plaintiff and/or was responsible directly or indirectly for Plaintiff's wrongful termination.

70.     At the time of Plaintiff's wrongful termination, Defendant Maximo was a supervisor, an individual within the employer's organization with the authority to direct and control the work performance of Plaintiff, as the affected employee and take corrective action in response to any violation of the law, rule or regulation of which the employee complains and/or was the individual designated by the employer with responsibility for providing notice required pursuant to N.J.S.A. 34:19-7, within the definition of the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-2(d).

71.     Plaintiff is an employee within the definition of the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-2(b).

72.     Defendants' retaliatory termination of Plaintiff because he would not waive his right to receive wages as a non immigrant worker at least equal to the actual wages paid by the employer to other workers with similar experience and qualifications in accordance with federal laws(s) and regulation(s) constituted a violation of the New Jersey Conscientious Employment Protection Act, N.J.S.A. 34:19-1 et seq.

23

73.     Defendants conduct, as set forth in the Complaint, in terminating Plaintiff because he refused to waive his right to be paid wages as a non-immigrant worker at least equal to the actual wages paid by the employer to other workers with similar experience and qualifications in conformance with *inter alia*, the Immigration and Nationality Act ("INA"), 8 U.S.C. 1101 et seq., the Code of Federal Regulations, 20 CFR Ch. V, as applied to the H-1B non-immigrant visa classification for specialty occupations constituted wrongful retaliatory action within the definition of the New Jersey Conscientious Employment Protection Act, N.J.S.A. 34:19-2(e).

74.     Plaintiff objected to, or refused to participate in Defendant's activity, policy or practice of paying less than comparable wages to non-immigrant workers as set forth herein based on his reasonable belief that same was: a) in violation of a law, or a rule or regulation promulgated pursuant to law, b) fraudulent or criminal; or c) incompatible with a clear mandate of public policy concerning the public health, safety or welfare.

75.     Plaintiff's refusal to waive his right to be paid wages as per the above, was protected from retaliatory action by Defendants pursuant to the New Jersey Conscientious Employment Protection Act, N.J.S.A. 34:19-3, which states that:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:
>
> ...[c] Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
>
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, if the employer is a licensed or certified health care professional, constitutes improper quality of patient care;
>
> (2) is fraudulent or criminal, including any activity, policy or practice of

24

deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient, or customer, employee, former employee, retiree or pensioner of the employer or any governmental entity;

(3) is incompatible with a clear mandate of public policy concerning the public health, safety, or welfare or protection of the environment.

76. Defendants Sering and Maximo participated in the wrongful termination of Plaintiff from his employment with Defendants, Seven Seven Software, Seven Seven Corporate Group and/or Seven Seven Gobal Services following his refusal to agree to waive his legal right to receive a comparable wages as a non-immigrant worker, as provided by law.

77. Thus, there is a causal connection between the whistle blowing activity by the Plaintiff, and Defendants' retaliatory conduct that resulted in his wrongful termination, which is protected by the New Jersey Conscientious Employment Protection Act, N.J.S.A. 34:19-3[c].

78. As a direct and proximate result of Defendants' actions, Plaintiff has suffered damages, including but not limited to emotional distress, mental pain and anguish, and continues to suffer substantial losses in earnings, job experience, retirement benefits, and other employee benefits that he would have received absent Defendants' unlawful conduct.

WHEREFORE, Plaintiff Gary D. Abella demands judgment against Defendants Seven Seven Seven Softwares, Inc., Seven Seven Corporate Group , Seven Seven Global Services, Inc., Elmer L. Maximo, and Adela Sering, also known as Adela Sering-Fojas, John Does 1-10 (names being fictitious) and ABC Companies 1-10 (names being fictitious) for compensatory damages and statutory relief pursuant to N.J.S.A. 34:19-5, including but not limited to the following:

a) reinstatement to the same or equivalent position held before Defendants' termination of Plaintiff from employment;

b) reinstatement of full fringe benefits and seniority rights;

25

c)      compensation for all lost wages, benefits, and other remuneration;

d)      payment of Plaintiff's reasonable costs and attorney's fees;

e)      civil fines; and

f)      punitive damages.

## COUNT TWO-BREACH OF CONTRACT

79.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 78 of the Amended Complaint, as if incorporated by reference herein.

80.    In or about May 2004, Plaintiff interviewed for an employment position with CyberJ Resources, an entity owned and/or controlled by Sering, the owner and principal of Seven Seven Softwares and Seven Seven Corporate Group of Rockaway, New Jersey and subsequently executed a two year employment agreement with the company. Subsequently, CyberJ Resources was merged into Seven Seven Softwares/Seven Seven Corporate Group and/or its alter ego, affiliate, subsidiary, agent, representative, branch or assign, Seven Seven Global Services.

81.    Thereafter, Plaintiff entered into negotiations regarding the proposed terms and conditions of a certain MOU with Defendant Maximo, who represented expressly or implicitly that he was acting on behalf of Seven Seven Softwares /Seven Seven Corporate Group regarding Plaintiff's employment in the Philippines and the United States. In connection therewith, Maximo represented that he had authority to bind the Defendant(s) to process Plaintiff's application for permanent labor certification and immigration papers by way of a "green card", provided *inter alia*, that Plaintiff remained an employee in good standing for two years.

82.    Throughout the negotiations leading to the execution of the MOA by Defendants and their conduct post-execution with regard to implementation of the terms and conditions set

forth therein, the Defendants, including but not limited to Maximo expressly or impliedly, represented that Seven Seven Global Services was the alter ego, subsidiary, agent, affiliate, branch or agent of Seven Seven Softwares/Seven Seven Global Services, such that all Defendants were responsible for the compliance obligations thereunder.

83.     Without advance notice to Plaintiff, Defendants substituted Seven Seven Global, Services, its affiliate, subsidiary, agent, representative, branch or assign, as a direct party to the MOU in lieu of Seven Seven Softwares and/or Seven Seven Corporate Group at the last minute without obtaining Plaintiff's consent or explaining the potential legal ramifications of same.

84.     The execution of the MOU on December 2, 2006 constituted a binding contract on all parties, specifically Defendants Seven Corporate Group, Seven Seven Softwares and their alter ego, affiliate, subsidiary, representative, agent branch or assign, Seven Seven Global Services.

85.     By the terms of the MOU, Defendant Seven Seven Global Services was required to sponsor the processing of Plaintiff's permanent labor certification and immigration papers to permit him to receive a "green card", provided that Plaintiff met his reciprocal obligations under the agreement.

86.     Following the assignment by Seven Seven Global Services to Seven Seven Softwares/Seven Seven Corporate Group of the obligations imposed on Defendants under the MOU in or about June 2007, Plaintiff fully performed thereunder and remained employed for two years in good standing with Defendants. Plaintiff continued to perform the jobs, functions and services embodied within the MOU as required therein until his wrongful termination in September 2012.

87.     Defendants Seven Seven Softwares and Seven Seven Corporate Group's conduct

27

in proceeding with the processing of Plaintiff's "green card" application, which they subsequently conditioned on their unlawful demand that Plaintiff waive his right to be paid a prevailing wage as a non-immigrant worker, constituted a ratification by these parties of the terms and conditions contained in the MOU.

88.     The failure by Defendants Seven Seven Softwares and Seven Seven Corporate Group's to comply with the obligations required under the MOU constituted a breach of contract, as the parent company, successor in interest, assignee, agent, representative, branch, alter ego or affiliate of its subsidiary, Seven Seven Global Services (through Seven Seven Corporate Group which conducts business in both the Philippines and New Jersey through Seven Seven Softwares).

89.     Due to the existence of an integrated enterprise amongst the Defendants, failure to impose liability on the Defendants Seven Seven Softwares and/or Seven Seven Global Services for the their breach of contract for failing to comply with the MOU would impose an injustice on the Plaintiff, who fully complied with his contractual obligations thereunder.

90.     Defendant s Sering and Maximo are individually liable for breach of contract by Defendants Seven Seven Corporte Group, Seven Seven Softwares and Seven Seven Global Services based on their  misuse of the corporate form to avoid and/or limit liability under the MOU for Defendants' failure to perform thereunder, their individual fraud and the fraud of Seven Seven Softwares, Seven Seven Corporate Group and Seven Seven Global Services in connection with inducing Plaintiff to execute the MOU and continuing to remain employed thereunder, their decision to unlawfully terminate Plaintiff under the pretext of being unable to locate additional work assignments and their personal liability for conduct by the unincorporated entity, Seven Seven Corporate Group, the alter ego, subsidiary, affiliate, representative , agent, branch or assign

28

of Seven Seven Softwares and/or Seven Seven Global Services.

91. As a direct and proximate result of Defendants' breach of the MOU, Plaintiff has suffered damages for breach of contract, including but not limited to loss of earnings, job experience, retirement benefits, and other employee benefits that he would have received absent Defendants' unlawful conduct.

WHEREFORE, Plaintiff Gary D. Abella demands judgment against Defendants Seven Seven Softwares, Inc., Seven Seven Corporate Group. Seven Seven Global Services, Inc., Elmer L. Maximo, and Adela Sering, also known as Adela Sering-Fojas, John Does 1-10 (names being fictitious) and ABC Companies 1-10(names being fictitious) for compensatory damages, together with interest, attorney's fees and costs of suit.

## COUNT THREE- FRAUD

92. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 91 of the Amended Complaint, as if incorporated by reference herein.

93. Defendants actions herein, including but not limited to those of Defendant Maximo, in his individual capacity and on behalf of Defendants Seven Seven Softwares, Seven Seven Corporate Group and Seven Seven Global Services in inducing Plaintiff to enter into the MOU with the expectation that if Plaintiff performed his obligations as required thereunder, Defendants (e.g., Seven Seven Softwares, Seven Seven Corporate Group and/or Seven Seven Global Services) would process his "green card" application to permit him to remain in the United States permanently without imposition of additional non-contracted for conditions and Defendants subsequent performance under the agreement constituted fraud.

94. In so doing, Defendants engaged in material misrepresentations of a presently

existing or past fact, with knowledge or belief of its falsity, with the intention that Plaintiff rely on said misrepresentations together with reasonable reliance by the Plaintiff on Defendants promises and representations and resulting harm suffered by the Plaintiff.

95. Defendants conduct herein constituting acts of fraud and/or fraud in the inducement include but are not limited to the following:

a. Defendants disregard of the corporate form in their misrepresentations by acts of omission (e.g., failure to advise that the named party to the agreement would be Seven Seven Global Services) and commission (e.g., representations by Maximo, Macario Fojas and Cathy Alonso on behalf of Seven Seven Softwares/Seven Seven Corporate Group in negotiations leading to the execution of the MOU, which Plaintiff relied on in support of his belief that the agreement was enforceable against all Defendants, so as to induce Plaintiff to execute a MOU identifying Seven Seven Global Services as a signatory rather than Seven Seven Softwares and/or Seven Seven Corporate Group constitutes fraud in the inducement.

b. Conduct by Defendants in engaging in "bait and switch" in connection with submission of the MOU for Plaintiff to execute in or about December 2, 2006, whereby Defendants at the last minute substituted Seven Seven Global Services as the sole signatory to the MOU for the other Defendants, with the intent to limit Plaintiff's ability to enforce claims for damages arising out of a default by Defendants in compliance under the agreement in New Jersey or elsewhere in the United States and to recover on any judgment.

c. Defendants misuse of the corporate form by their interchangeable use of the "Seven Seven Corporate Group" throughout their relationship with Plaintiff contractual or otherwise (e.g., negotiations prior to December 2, 2006 and thereafter with Maximo, Marcario Fojas and Cathy Alonso) and in the performance of Defendants obligations thereunder), relating to Seven Seven Global Services in the Philippines and Seven Seven Softwares in New Jersey and elsewhere in the United States with the intent to mislead Plaintiff as to which entity was responsible thereunder.

d. Defendants materially misrepresented to Plaintiff the nature of his site visit to New Jersey for purposes of inducing him to continue to remain employed under the MOU while working on a project for Bear Stearns in 2007 for which they were being compensated by Bear Stearns. As set forth herein, Plaintiff alleges that Defendants improperly entered into an arrangement with Bear Stearns whereby Plaintiff was required to render services for Bear Stearns that he

believed to be in violation of the B1/B2 visa issued to him by the United States in connection with his trip to New Jersey in or about May 2007. Defendants dis so without disclosing same to Plaintiff prior to his traveling from the Philippines to New Jersey at that time.

e. Defendants materially misrepresented to Plaintiff that they would process his application for a "green card" without advising him that Defendants could unilaterally implement changes in the terms and conditions for processing same. This permitted Defendants to cancel the process and then restart same conditioned on additional restrictions imposed on Plaintiff that were not included in the MOU on a "take it or leave it" basis, under threat of loss of employment and compelled return to the Philippines.

f. Defendants Sering and Maximo are individually liable as corporate officers (e.g., Sering, as President and Chief Executive Officer of Seven Seven Softwares and Seven Seven Corporate Group and Maximo as Vice President and Senior Managing Director for Seven Seven Global Services HR and Vice President of Seven Seven Corporate Group, for the fraudulent misrepresentations by Seven Seven Softwares, Seven Seven Corporate Group and Seven Seven Global Services in inducing Plaintiff to enter into the MOU, commit himself to remain employed with Defendants for two years, and then compelling his continued employment and subsequent termination, when he refused to waive his statutory right to be paid a prevailing wage and the companies fraudulent performance thereunder.

96. The actions undertaken by Defendants herein constituted fraud and/or fraud in the inducement in connection with their obligations under the MOU, which the Plaintiff relied on in connection with performing his obligations thereunder, to his detriment.

97. As a direct and proximate result of Defendants' actions, Plaintiff has suffered damages.

WHEREFORE, Plaintiff Gary D. Abella demands judgment against Defendants Seven Seven Softwares, Inc., Seven Seven Corporate Group. Seven Seven Global Services, Inc., Elmer L. Maximo, and Adela Sering, also known as Adela Sering-Fojas, John Does 1-10 (names being fictitious) and ABC Companies 1-10 (names being fictitious) for compensatory damages, together with interest, attorney's fees and costs of suit.

## COUNT FOUR-FRAUD IN THE PERFORMANCE

31

98.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 97 of the Amended Complaint, as if incorporated by reference herein.

99.     Defendants conduct herein that constitutes acts of fraud in the performance of its obligations under the MOU, include but are not limited to, he following:

a)      Beginning in June 2008, Plaintiff initiated discussions with Defendant Maximo regarding his promised "green card" sponsorship. After several months of preparing the appropriate application and supporting documents, Plaintiff received a copy of the finalized forms for his verification and signature from Aurelio Caparas, Esq., attorney for Seven Seven Corporate Group/Seven Seven Softwares in the United States, with the process of the "green card" based on Plaintiff's L-1A position as a Project Manager. In March 2009, Plaintiff returned the signed copies of the forms, together with supporting documents requested by Mr. Caparas only to be advised two months later by Mr. Caparas that the application could not be filed due to lack of supporting documents. Defendant Maximo represented to Plaintiff that he would provide the necessary supporting documents requested by Defendants' attorney, but failed to do so. Throughout that period, the representations by Defendant that they would continue to process the "green card" were relied on by Plaintiff, who continued to remain employed with Defendants.

b)      Due to the limitations of Plaintiff's L-1A visa, which is reserved for intracompany transfers only, Plaintiff was compelled to remain employed with Defendants under the terms of the MOA. On July 21, 2009, Plaintiff wrote to Maximo at Seven Seven Softwares/Seven Seven Corporate Group, which he followed up with an email, requesting that Defendants comply with the MOA and process his green card immediately.

c)      In response to Plaintiff's letter, the Defendants advised Plaintiff that he had only two options available to him: a) agree to restart his "greed card" processing via a PERM Labor Certification process and change his L-1A visa to an H-1B visa or b) resign. Faced with this ultimatum, Plaintiff agreed to the change in the status of his visa to H-1B that would allow Seven Seven Softwares to process his "green card" application via PERM. The change of status was approved in January 2010, with the "green card" PERM (EB2) process initiated in March 2010.

d)      In June 2010, the wage determination for the PERM position was received and there was a significant salary disparity between Plaintiff's H-1B position and the PERM position. Due to this disparity, Maximo requested that

Plaintiff confirm in writing that the PERM position was "prospective" only, which was untrue, with Plaintiff compelled to waive his right to be paid in accordance with the salary requirements of the PERM prevailing wage determination.

e)    Plaintiff refused to sign the proposed confirmation letter due to the fact that the advertised PERM position was $110,822 annually and he was only being paid $75,000 per year. Although on October 1, 2010, Maximo advised that the company would continue with the "green card" process, seven months later on May 24, 2011, he insisted that the Plaintiff sign off on the conformation letter as a pre-requisite for Seven Seven Software's filing of the I-140 visa application. Plaintiff refused and thereafter, Defendants failed to file the I-140 application, resulting in the previously approved PERM lapsing on June 30, 2011.

f)    Thereafter, on June 24, 2012, Plaintiff spoke with Maximo by telephone together with Seven Seven Software's attorney, Mr. Caparas, and advised them that the client, Credit Suisse, would not extend his contract. Maximo told Plaintiff that the Defendants agreed to continue processing Plaintiff's H-1B extension and PERM processing; however, Plaintiff was advised by Mr. Caparas that it would be necessary to settle the disagreement over the discrepancy in salary between Plaintiff's H-1B position and the PERM position before he could file the H-1B visa extension application.

g)    Throughout this time period, dating back to June 2008, the Plaintiff continued to remain employed with Defendants' clients and did not seek employment elsewhere. Because Defendants failed to process the visa extensions to permit him to remain employed in the United States once Plaintiff refused to waive his right to a comparable wage, he could not obtain substitute employment and was force to return to the Philippines when his visa expired when Defendants refused to locate another project assignment for him.

100.    In the course of Defendants performance under the MOU and the processing of Plaintiff's "green card", they engaged in material misrepresentations of a presently existing or past fact, with knowledge or belief of its falsity, with the intention that Plaintiff rely on said misrepresentations together with reasonable reliance by the Plaintiff on Defendants promises and representations and resulting harm suffered by the Plaintiff.

101.    As a direct and proximate result of Defendants' fraud in the performance of their

obligations under the MOU, Plaintiff suffered damages.

WHEREFORE, Plaintiff Gary D. Abella demands judgment against Defendants Seven Seven Softwares, Inc., Seven Seven Corporate Group. Seven Seven Global Services, Inc., Elmer L. Maximo, and Adela Sering, also known as Adela Sering-Fojas, John Does 1-10 (names being fictitious) and ABC Companies 1-10 (names being fictitious) for compensatory damages, together with interest, attorney's fees and costs of suit.

## COUNT FIVE-CIVIL CONSPIRACY

101.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 100 of the Amended Complaint, as if incorporated by reference herein.

102.    In refusing to pay Plaintiff wages as a non immigrant worker at least equal to the actual wage paid by the employer to other workers with similar experience and qualifications as required by federal law and/or regulations and by demanding that Plaintiff waive his right to such wages, and upon his refusal to do so, terminating him as an employee, Defendants Seven Seven Corporate Group, Seven Seven Software, Maximo and Sering conspired together by way of a common design and for an unlawful purpose to violate federal law and applicable regulations, and state law protecting the interests of employees from retaliation under the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1 et seq. based on the predicate acts set forth in ¶¶16-50 of the Amendment to the Complaint.

103.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered both compensatory and special damages.

WHEREFORE, Plaintiff Gary D. Abella demands judgment against Defendants Seven Seven Softwares, Inc., Seven Seven Corporate Group. Seven Seven Global Services, Inc., Elmer

L. Maximo, and Adela Sering, also known as Adela Sering-Fojas, John Does 1-10 (names being fictitious) and ABC Companies 1-10 (names being fictitious) , for compensatory and special damages, together with interest, attorney's fees and costs of suit.

## COUNT SIX-BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

104.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 103 of the Amended Complaint, as if incorporated by reference herein.

105.    Defendants breached the covenant of good faith and fair dealing that they owed to the Plaintiff in connection as a result of their refusal to abide by their promises set forth Memorandum of Undertaking entered into on December 2, 2006.

106.    As a direct and proximate result of Defendants' breach of the Memorandum of Undertaking, Plaintiff has suffered damages, including but not limited to emotional distress, mental pain and suffering, loss of earnings, job experience, retirement benefits, and other employee benefits he would have received absent Defendants' unlawful conduct..

WHEREFORE, Plaintiff Gary D. Abella demands judgment against Defendants Seven Seven Softwares, Inc., Seven Seven Corporate Group. Seven Seven Global Services, Inc., Elmer L. Maximo, and Adela Sering, also known as Adela Sering-Fojas, John Does 1-10 (names being fictitious) and ABC Companies 1-10 (names being fictitious) for compensatory damages, together with interest, attorney's fees and costs of suit.

## COUNT SEVEN-WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

107.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 106 of the Amended Complaint, as if incorporated by reference herein.

108.    Defendants conduct as set forth herein, including but not limited to the acts and

omissions of Defendants, constitute a wrongful termination of Plaintiff in violation of public policy.

109.    As a direct and proximate result of Defendants' breach of the Memorandum of Undertaking, Plaintiff has suffered damages, including but not limited to emotional distress, mental pain and suffering, loss of earnings, job experience, retirement benefits, and other employee benefits he would have received absent Defendants' unlawful conduct.

## COUNT SEVEN-PUNITIVE AND EXEMPLARY DAMAGES

110.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 109 of the Amended Complaint, as if incorporated by reference herein.

111.    Defendants' conduct undertaken herein was malicious, wilful and wanton.

112.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered damages.

WHEREFORE, Plaintiff Gary D. Abella demands judgment against Defendants Seven Seven Softwares, Inc., Seven Seven Corporate Group. Seven Seven Global Services, Inc., Elmer L. Maximo, and Adela Sering, also known as Adela Sering-Fojas, John Does 1-10 (names being fictitious) and ABC Companies 1-10 (names being fictitious) for punitive and exemplary damages, together with interest, attorney's fees and costs of suit.

LAW OFFICES OF NEAL H. FLASTER, L.L.C.
Attorney for Plaintiff,
Gary D. Abella

By   *Neal H. Flaster*
      Neal H. Flaster, Esq.

Dated:    November 10, 2014

## JURY DEMAND

Plaintiff Gary Abella hereby demands trial by jury on all claims so triable.

Neal H. Flaster

Dated: November 10, 2014